IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**MARIA RIOS, on her behalf and on behalf of her minor son, D.R.,**

      **Plaintiffs,**

vs.                                                                                      **No.  08cv1213 JH/GBW**

**DOÑA ANA COUNTY, LINDELL WRIGHT, an investigator working for the Doña Ana County Sheriff's Department, BRENT EMMANUEL, SUSAN RIEDEL, and JAMES DICKENS ,**

      **Defendants.**

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**THIS MATTER** is before the Court on (1) Deputy District Attorneys' Written Objections to Magistrate's Report and Recommendation **[Doc. No. 105]** filed on July 6, 2010, and (2) Doña Ana County and Lindell Wright's Objections to the Magistrate Judge's Report and Recommendations on Defendants' Motion for Summary Judgment **[Doc. No. 108]** filed on July 9, 2010.  On May 7, 2010, pursuant to 28 U.S.C. §636(b)(1)(B), the Court entered its Order of Reference (Doc. No. 91), referring Defendants' Motion for Summary Judgment (Doc. No. 55) to the Honorable Don J. Svet for proposed findings of fact and recommendations for disposition of Defendants' motion.

On June 21, 2010, Judge Svet entered his Report and Recommendation, recommending the Court deny Defendants' Motion for Summary Judgment.  On July 6, 2010, Susan Riedel and James Dickens (hereinafter "DDAs") filed Deputy District Attorneys' Written Objections to

Magistrate Judge's Report and Recommendation.  On July 9, 2010, Doña Ana County and Lindell Wright (hereinafter "County Defendants") filed their Objections to the Magistrate Judge's Report and Recommendations on Defendants' Motion for Summary Judgment.

## I.  Standard of Review

Pursuant to 28 U.S.C. §636(b)(1), a party may object to a magistrate judge's proposed findings and recommended disposition by filing and serving written objections within fourteen (14) days after being served with a copy of the proposed findings and recommended disposition. When a party files timely objections, the district court must review *de novo* those portions of the proposed findings and recommended disposition to which objections are made.  *Id.*  In conducting its *de novo* review, the district court is not required to make specific findings but instead may simply indicate that it has undertaken the requisite review.  *Garcia v. City of Albuquerque*, 232 F.3d 760, 766-67 (10th Cir. 2000).  Objections to a magistrate judge's proposed findings and recommended disposition must be specific.  28 U.S.C §636(b)(1); *See also United States v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996). Generally, issues raised for the first time in objections to a magistrate judge's proposed findings and recommended disposition are deemed waived.  *See United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2001).

## II.  Analysis

### A.  Deputy District Attorneys' Objections

The DDAs do not dispute that on September 25, 2008, there was no judicial determination as to custody of DR between Plaintiff and Marvin Fielder, DR's biological father. Nonetheless, they object to Judge Svet's finding that on that day Fielder had no custodial right to DR.  *See* R & R at 2.  The DDAs claim Fielder had an enforceable right to custody or visitation

of DR under New Mexico Law as of September 25, 2008.  The DDAs contend that on that day there was a child support order in place ordering Fielder to pay child support for DR which they interpret as granting Fielder custody rights.  The DDAs also argue that because "no order existed prior to October 2008 that completely terminated or extinguished Marvin Fielder's parental rights pertaining to DR," "Plaintiff could not unilaterally deny Fielder visitation or other custody rights pertaining to DR based upon [non-payment of child support]."  DDAs' Objections to R & R at 2.[1]

On September 25, 2008, Plaintiff was charged with custodial interference in violation of N.M.Stat.Ann. §30-4-4(B).  Def.'s Mem. Support Mot. Summ. J.; Ex. G.  Section 30-4-4(A)(5) defines the "right to custody" as the right to physical custody or visitation of a child arising from (a) parent-child relationship between the child and a natural or adoptive parent absent a custody determination **or** (b) a custody determination.  Because there was no judicial determination as to custody of DR, Fielder, as DR's natural parent, asserts a right to custody based on a parent-child relationship pursuant to §30-4-4(A)(5)(a).

Judge Svet found that although Fielder was DR's biological father, nonetheless, there was no parent-child relationship between DR and Fielder.  Judge Svet made this finding based on the following undisputed facts: (1) on September 25, 2008, when DR was eight years old, Fielder had seen DR twice, once when DR was an infant and once when DR was five years old when Plaintiff took DR to visit Fielder while Fielder was incarcerated; (2) on both occasions Plaintiff initiated the visits; (3) after Fielder was released from prison he never saw DR again

---

[1] Plaintiff disputes this allegation.

until September 25, 2008; (4) calls and letters from Fielder to DR were inconsistent; and (5) Fielder had not paid child support for several months.  R & R at 2, 3-4.

　　　　The Court notes that the State District Court also found there was no parent-child relationship between DR and Fielder.  *See* Pls.' Mem. Resp. Def.'s Mot. Summ. J., Ex. D (statement by State District Judge to Fielder that Fielder only provided the "biological material" but had no custodial rights to DR); *see also* Defs.' Mem. Support Mot. Summ. J., Ex. D (Fielder reporting to Defendant Wright that the State District Judge who held the custody hearing called him "a sperm donor").  Moreover, County Defendants concede Fielder had "a minimal relationship" with DR and never petitioned the Court for custodial or visitation rights to DR.  *See* Defs.' Mem. Support of Mot. Summ. J. at 2 ("Fielder had a minimal relationship with DR."); *see also, id.*; Ex. E, Emmanuel Dep., p.32, lines 18-24 (testifying Fielder was a stranger to DR).

　　　　The DDAs also argue that Plaintiff could not unilaterally deny Fielder visitation or other custody rights to DR based upon the non-payment of child support.  Plaintiff disputes she ever denied Fielder visitation with DR based on his non-payment of child support.  Plaintiff testified that prior to September 25, 2008, she contacted Fielder to set up visitation with DR.  *See* Pl.'s Resp.; Ex. C, Rios Dep., p. 24, lines 19-25.  Plaintiff met Fielder at a restaurant in Las Cruces to discuss visitation.  However, Fielder ended the discussion when Plaintiff would not agree to grant him overnight or summer visitation with DR until DR got acquainted with Fielder because DR had only seen Fielder once and didn't know him.  *Id.*, Ex. C, Rios Dep., p. 25, lines 1-21.

　　　　The Court considers Fielder's non-payment of child support a conscious disregard of his financial obligation to DR.  Additionally, there was a conscious disregard by Fielder of his parental obligations when he failed to maintain personal contact with DR.  The Court views the evidence and draws inferences in the light most favorable to Plaintiff and finds that no parent-

4

child relationship existed between Fielder and DR on September 25, 2008. Fielder had not established a custodial or personal relationship with DR at the time of the incident and thus had no custodial right to DR. Accordingly, the Court overrules the DDAs' objection as to Judge Svet's finding that there was no parent-child relationship between Fielder and DR and thus Fielder had no custodial right to DR on September 25, 2008.

The DDAs also object to Judge Svet's finding that probable cause did not exist for Plaintiff's arrest on September 25, 2008. The DDAs argue that because Fielder had an enforceable right to custody of DR as of September 25, 2008, Plaintiff was properly detained and arrested. Because the Court has overruled the DDAs' objection to Judge Svet's finding that Fielder had no custodial right to DR on September 25, 2008, it also will overrule this objection.

**B.  County Defendants' Objections**

    **1.  Objection to Investigative Detention Finding**

The County Defendants object to Judge Svet's finding that Defendant Wright's interaction with Plaintiff at the Teakwood Inn was not an investigative detention supported by reasonable suspicion. What Judge Svet found was that Defendant Wright "quickly exceeded the scope and duration of Plaintiff and DR's detention and it became an arrest." R & R at 12. Viewing the evidence set forth below in the light most favorable to Plaintiff, the Court will overrule this objection.

First, Fielder knew Plaintiff was in town on September 25, 2008, and staying at the Teakwood Inn because Plaintiff called him to set up a visit with DR. Plaintiff testified that when she arrived in Las Cruces, she called Fielder at work and told him, "[B]asically told him that we were both in town, [DR] and I were both in town, and that we were going to stay at a hotel, and

that if he wanted to have a visit with [DR] that he could come and visit him and have a visit." Defs.' Mem. Support. Mot. Summ. J.; Ex. A, Rios Dep., p. 69, lines 7-12.

However, while at the Teakwood Inn, Plaintiff contends she discovered she was missing a Gatorade bottle she had purchased earlier and went to her car to look for it. Plaintiff and DR were barefoot in the Teakwood Inn parking lot looking for the Gatorade bottle in her car. Pl.'s Mem. Resp. Mot. Summ. J.; Ex. C, Rios Dep., p. 77, lines 1-17. Plaintiff had the door to the driver's side of the car open when she saw police officers in the parking lot. In her deposition, Plaintiff testified,

> There was a pickup– double cab pickup behind my car, and then there was – in the parking lot I saw a marked unit in the corner. And then there was an unmarked unit closer to my car, probably about two spaces below– or probably about three spaces from my car. And they came running–

\* \* \* \* \*

> There was a uniformed officer right on the entrance of the parking lot and he was walking back and forth. And these two men came running out towards us. And I had the door open trying to look for the Gatorade. And he basically said, "Where are you going? Where are you going? Don't even think about taking off."

\* \* \* \* \*

> Well, he just went off. He started yelling at me and stating, "Where are you going? Don't think about taking off. Mr. Fielder has a right to see his kid. And you're – you're – I can arrest you for a fourth-degree felony, custodial interference. You have kept his child away from him for three years."
>
> And I was in complete shock. I kept telling him, "What's going on? What's going on? I don't understand what's going on." And he kept saying, "Well," he's like "I can arrest you if you don't let him see him." He just kept yelling at me, in my face. And, basically, it came to the point where I was crying, my son was crying. I mean, he came out like a bulldog and just attacked us."

*Id.*; Ex. C, Rios Dep., p. 78, lines 1-6, p. 80, lines 8-15, p. 81, lines 17-25, p. 82, lines 1-7.

Plaintiff contends the attack went on for an hour in the parking lot with Defendant Wright

6

yelling at her and demanding she agree to let Fielder have a visit with DR otherwise he would arrest her.

After an hour, Defendant Wright informed Plaintiff she had to drive to the Sheriff's Department or he would arrest her and take DR away from her. In response to this threat, Plaintiff said she would go to the Sheriff's Department. Plaintiff testified,

> And at one point he told me that he would arrest me if I didn't cooperate, and told me I had to drive to the sheriff's department.
>
> He told me I had to drive to the sheriff's department or else he would arrest me and take my son away.
>
> And at that point I said, "Well, I need to get my stuff out of the hotel. I need to get my purse." They walked us into the hotel room. And they stayed out in the hallway, and we went into the hotel room. And I had told him too that I needed to put our shoes on. We needed to put our shoes on. So we went in and put our shoes on. I got my purse, and I walked back out.
>
> * * * * *
>
> Well, he wasn't asking me, but he was telling – he was yelling at me, "You have to follow us. You have to follow us or else I will put you under arrest. I will put you under arrest. I will put you under arrest and take [DR]."
>
> And I didn't want them to take [DR], so I drove and did what he asked.
>
> We went – I was pulling out of the parking lot. Lindell was in front of me. And when we were going past the freeway, the cowboy's [Defendant Emmanuel] double-cab truck pulled up right beside me on my left side, and then the other car was behind me– the marked car was behind me, so I was surrounded.
>
> And so Lindell was doing signs, you know to follow him. And he basically did signs to go into the– into the back parking lot of the sheriff's department.
>
> Like I said, I thought it was a – I thought it was a bad dream, so I just did what they asked, took my son out. And we followed– they made us follow them through, like a hallway. And they made us sit, like in a room like this with a big table in the middle.
>
> [In the interrogation room] Lindell was still accusing me of not letting Mr. Fielder see his son. He was telling me that I could get arrested for a fourth-degree felony.

> He kept saying, "In this state I can arrest you for this." He kept saying, you know that "You need to agree to a visit for Mr. Fielder."

*Id.*; Ex. C, Rios Dep., p. 84, lines 1-22, p. 86, lines 20-25, p. 87, lines 1-25,  p. 88, lines 1-10.

At one point, Defendant Wright left the interrogation room.  Two women from the Victim's Assistance Unit then entered the room and asked to take DR while Plaintiff continued her business with Defendant Wright.  The women assured Plaintiff they would bring DR back once she was finished.  Plaintiff agreed to have DR go with them.  After they left, Defendant Wright returned.  Plaintiff testified,

> And then Lindell Wright came back in, started accusing me again, stating that Mr. Fielder was in the building in a different room, and that he wanted to see his son. And again, he kept saying that he could arrest me for custodial interference and for not letting him see his son for the past three years. And he just went on and on. And he told me that he had spoken to Mr. Fielder, and that Mr. Fielder wanted a visit.
>
> And I said, "That's fine." And then he left. And he left me there probably for like 30 minutes. And then he comes back in and tells me that Mr. Fielder want to see him for two days. And at that point I said, "No." I said, "I don't agree to that." I said, 'We have– we have– to plans and our plans were to leave tomorrow."
>
> I mean – he left several times from the room. And he left again and came back in. And he had a big old stack of papers and was trying to scare me. He slammed them on the table and said, "I've spoken to the DAs, and what I'm doing is right. I'm going to arrest– I can arrest you, and this and that, and you're denying Mr. Fielder to see his son."
>
> And I just sat there. And I was just like, whatever. And then a couple of– I believe it was a couple of deputies came in, into the room. And after he told me that he talked to the DAs and that– that he had mentioned that it was okay for him– for him to arrest me, a deputy came up behind me. And he's like, "Go ahead and put the handcuffs on her."
>
> And he put the handcuffs on me and he grabbed me by my arm and dragged me down the hallway, and then took me to a little– a little room that had a bench on it and a cuff– a metal cufflink, and he cuffed my hand to the metal cufflink.
>
> And I looked at him and I said, "What is he arresting me for?" And he's like, "He's getting you for custodial interference, which is a felony."

>And then they took my personal– they took my purse and looked through all the belongings and did like a paper, filling all th stuff in that they had of my belongings. And then one of the deputies came up and asked me why I had a license from Nebraska. And I said. "Because I live in Nebraska." And then he came up with my Wells Fargo checking care. And he said, "Why do you have a Wells Fargo card?" And I said, "Because I bank with Wells Fargo."

*Id.*; Ex. C, Rios Dep., p. 89, lines 22-25, p. 90, lines 1-25, p. 91, lines 1-25, p. 92, lines 1-17.

In his deposition, Defendant Wright testified as follows. Corrie Stone, Fielder's wife and Doña Ana County's IT Tech, called Defendant Wright at work in early August to complain about Plaintiff not allowing Fielder to see DR. Defs.' Mem. Support Mot. Summ. J.; Ex. C, Wright Dep., p. 59, lines 20-25, p. 60, lines 1-25. Defendant Wright testified he recognized Stone's voice when she called as he talked to her every time he forgot his password and that occurred "a lot." *Id.*; Ex. C, Wright Dep., p. 61, lines 3-4. In that initial call, Stone reported Fielder had not been allowed to see DR for three years because Plaintiff and DR were in Mexico. However, Plaintiff testified she had been in Mexico for one year. Nonetheless, Defendant Wright testified that he did not get "any sense that she was complaining about criminal activity or kidnapping, or anything like that." *Id.*; Ex. C, Wright Dep., p. 64, lines 5-9. Defendant Wright also testified Stone had not informed him that during the three years Fielder had not seen DR, Fielder was in the penitentiary for some of that time, creating the impression that Plaintiff had kept DR from Fielder for three years. *Id.*; Ex. C, Wright Dep., p. 65, lines, 1-25. Pl.'s Resp.; Ex. C. Rios Dep., pp. 3-4.

The second telephone call involved both Stone and Fielder. Fielder spoke with Defendant Wright and informed him that Plaintiff had not allowed him to see DR for three years but failed to inform him that part of the time he was in the penitentiary. *Id.*, Ex. C, Wright Dep., p. 73, lines 1-8. At his deposition, Defendant Wright testified he still "didn't know the time

frame that Fielder did [time in the penitentiary]." *Id.*, Ex. C, Wright Dep., p. 65, lines, 17-18, *see also*, p. 73, lines 2-9 (referring to his report of the September 25, 2008 incident, "I couldn't get a good grasp on where– how long the incarceration and where the three years– I couldn't make a timeline of this.").

Defendant Wright testified that on September 25, 2008, Fielder called him on Defendant Wright's personal cell phone to report that Plaintiff and DR were at the Teakwood Inn and would be taking DR to Mexico before he would have a chance to go before the court to establish his parental rights. *Id.*; Ex. C, Wright Dep., p. 105, lines 4-22. Fielder had not taken any steps to go before the court to adjudicate custody or visitation rights to DR even though Defendant Wright had advised Fielder and Stone to do so since the initial telephone call in early August. *Id.*, lines 11-16.

Defendant Wright testified his "plan was to speak with [Plaintiff] and see if they would be willing to work with each other, and leave law enforcement out of this, and go to court and get a parenting plan though a judge." *Id.*, Ex. C, Wright Dep., p. 107, lines 22-25. Defendant Wright testified that although he did not want to arrest Plaintiff she "tied my hands and I was stuck" when "she refused to allow Mr. Fielder to see DR." *Id.*, p. 108, lines 22-25.

Defendant Wright testified, "My whole point in this is for them to end up in a court hearing eventually– and then the courts deem a plan for him– or them." *Id.*, p. 115, lines 21-25, p. 116, line 1. Defendant Wright testified his intent was "to convince Plaintiff to allow DR to stay with Mr. Fielder until she could get a court order adjudicating her rights." *Id.,* p. 117, lines 1-5. As to how long Fielder was to keep DR, Defendant Wright testified,

> Ms. Rios asked me that, and she was, like, Well, how long? And I said, Well, you–
> right from the minute you walk out of here, go get a lawyer and– or go file. And I
> said, They have Victim – well, not Victim Assistance– what we talked about earlier,

10

>     where you go to – prelegal help.  I said, You can go do that, and she agreed, she
>     started agreeing.  And I said, You know the courts will have an emergency hearing,
>     and a custodial emergency hearing, and, you know, it could be in a couple of days.
>     I can't guarantee what the court's docket is or how fast they can expedite it.  But, I
>     said, You know, At the time being, he hasn't seen him in three years, in which she
>     agreed and we're heading down the right road, and the she decided not to.

*Id.*, p. 116, lines 10-25.

"An investigative detention is a seizure within the meaning of the Fourth Amendment, but unlike an arrest, it need not be supported by probable cause.  An officer can stop and briefly detain a person for *investigative purposes* if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007)(internal citation and quotations omitted)(emphasis added).  In assessing the reasonableness of an investigative stop, the Court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstance which justified the interference in the first place."  *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct 1868, 1879 (1968).  "An arrest is distinguished by the involuntary, 'highly intrusive' nature of the encounter."  *Cortez*, 478 F.3d at 1115.  The use of "forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest."  *Id.*  Applying the standards governing the limits for a permissible *Terry* stop, the Court finds that Defendant Wright exceeded these limits.

Defendant Wright stopped and detained Plaintiff and DR based on Fielder and Stone's allegations that Plaintiff had denied Fielder visitation with DR for three years and she would be leaving to Mexico before he could go before a court to adjudicate his visitation rights.  Based on Fielder and Stone's allegations, Defendant Wright concluded Plaintiff was committing the crime of custodial interference.  Thus, even if mistaken, Defendant Wright had reasonable suspicion to

*briefly detain* Plaintiff in order for him to investigate Fielder and Stone's allegations. However, Defendant Wright has not produced any evidence showing he engaged in any investigation to confirm or dispel his suspicions of custodial interference once he detained Plaintiff. *See United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575 (1985)("In assessing whether a detention is too long in duration to be justified as an investigatory stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."). He never questioned Plaintiff regarding Fielder's allegations. From his own testimony, Defendant Wright did not detain Plaintiff to investigate the matter but to ensure that Fielder get visitation and custody of DR on that day. The only way Defendant would not arrest Plaintiff was if she complied with his demand that she allow Fielder to have custody of DR until she went to court to adjudicate *her* custodial rights. He never questioned Plaintiff about where she resided or why she had Nebraska license plates. In his deposition, Defendant Wright testified, "All I knew, there was a Nebraska plate on her car, and I didn't know what that– Well, I didn't know what – if that was– if she was from Nebraska. It just– all I knew, that she was living in Mexico and that she was going to go back to Mexico." Defs.' Mem. Support Mot. Summ. J.; Ex. C, p. 121, lines 15-21. Fielder provided this information and Defendant Wright never questioned it even though Plaintiff was driving a car with Nebraska plates.

    Moreover, Plaintiff's encounter with Defendants Wright and Emmanuel was highly intrusive and involuntary. Two officers running at a mother and her child screaming at her that she could not leave is intrusive and frightening. Defendant Wright's approach to Plaintiff also was accusatory and coercive. Once Defendant Wright threatened to take DR if Plaintiff did not follow him to the Sheriff's Department, the investigative detention escalated into an arrest.

*United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990)("Once the officer told Arango to come with them to the sheriff's office, the line between detention and *de facto* arrest was crossed."). Threatening to take DR away from Plaintiff most likely was the most forceful technique Defendant Wright could apply to ensure Plaintiff complied with his directive that she follow him to the Sheriff's Department. In addition, Defendant Wright and the two other officers escorted Plaintiff to the Sheriff's Department in a manner that would have made it clear to a reasonable person in Plaintiff's position that she had no choice but to comply with Defendant Wright's directive. To reiterate, Defendant Wright exceeded the limits for a permissible *Terry* detention. Accordingly, County Defendants' objection is overruled.

### 2.  Objection to Probable Cause Finding

Defendants also object to Judge Svet's finding that Defendant Wright lacked probable cause to arrest Plaintiff for custodial interference. The Court has reviewed Judge Svet's bases for this finding and agrees with his analysis and thus overrules County Defendants' objection.

### 3.  Other Objections

County Defendants also object to the following: (1) Judge Svet's finding that the extraordinary circumstances doctrine is inapplicable to this case; (2) Judge Svet's finding that summary judgment is precluded as to Plaintiff's family association claims; (3) Judge Svet's finding that summary judgment is precluded as to Plaintiff's *Monell* claims; and (4) Judge Svet's finding that summary judgment is precluded as to Plaintiff's state law claims. County Defendants argue that because Defendant Wright did not violate Plaintiff's Fourth Amendment rights they are entitled to summary judgment as to Plaintiff's family association claims, *Monell* claims, and state law claims. Since the Court did not sustain County Defendants' objections as

to Judge Svet's finding that Defendant Wright lacked probable cause to arrest Plaintiff, these objections will be overruled.

As to County Defendants' objection to Judge Svet's finding that the extraordinary circumstances doctrine is inapplicable to this case, the Court overrules the objection. Consultation with an attorney can create the extraordinary circumstances that excuse a violation of clearly established law. However, "the 'extraordinary circumstances' exception to the rule that a qualified immunity defense fails where the defendant violated a clearly established right applies only 'rarely.'" *V-1 Oil Co. v. Wyoming Dep't of Envtl. Quality*, 902 F.2d 1482, 1488 (10th Cir. 1990). "[T]he question is whether the consultation so prevented [Defendant Wright] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right." *Lawrence v. Reed*, 406 F.3d 1224, 1231 (10th Cir. 2005). The Court looks to the totality of the circumstances, including such factors as: (1) how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, (2) whether complete information had been provided to the advising attorney(s), (3) the prominence and competence of the attorney(s), and (4) how soon after the advice was received the disputed action was taken. *Id.* (quoting *V-1 Oil*, 902 F.2d at 1489) (internal citations omitted).

In this case, Defendant Wright did not provide complete information to James Dickens, the advising attorney. In his deposition, Dickens testified he advised Defendant Wright during the first call to make contact with Plaintiff because he needed to "hear from both parties" that "he needed to get more facts." County Defs.' Objections to R & R; Ex. I, Dickens' Dep., p. 19, lines 3-10, p. 35, lines 23-25. Dickens further testified he was not sure Defendant Wright ever told him Plaintiff had called Fielder to let him know she was in town. *Id.*; p. 21, lines 15-23.

14

Dickens further testified that when Defendant Wright called the second time he informed Dickens he had made contact with Plaintiff at the Teakwood Inn but "she refused to provide Mr. Fielder with any visitation, not supervised visitation, certainly not staying with Mr. Fielder" that "she did not want [Fielder]– even if she was present, she didn't want him to have any contact with her son" and "she was intending to move to Mexico." *Id.*, p. 43, lines 7-12.  Significantly, Defendant Wright did not inform Dickens that he had transported Plaintiff to the Sheriff's Department or that he was going to arrest her.  Dickens testified, "We never discussed arrest of Ms. Rios." *Id.*  Dickens testified he did "not tell officers to arrest or not to arrest" so when he said to Defendant Wright "sounds like you have a case" he assumed Defendant Wright "would present it to my office for prosecution since it's a felony offense, [b]ut whether he would seek a warrant at that time or an arrest at that time, I did not know." *Id.*, p. 46, lines 14-15, p. 47, lines 13-16.

Based on the evidence presented, the Court finds that the extraordinary circumstances exception does not apply to this case.  Accordingly, the Court overrules County Defendants' objection to Judge Svet's finding that the extraordinary circumstances exception did not apply and thus Defendant Wright was not entitled to qualified immunity.

## C.  Conclusion

Upon careful consideration of the Deputy District Attorneys' objections and the County Defendants' objections and the applicable law, the Court finds that the objections should be overruled.  Accordingly, the Court will overrule Deputy District Attorneys' objections and the County Defendants' objections, adopt the R & R, and deny Defendants' Motion for Summary Judgment (Doc. No. 55).

**IT IS THEREFORE ORDERED** that District Attorneys' Written Objections to Magistrate Judge's Report and Recommendation (Doc. No. 105) are **OVERRULED**.

**IT IS FURTHER ORDERED** that the Doña Ana County and Lindell Wright's Objections to the Magistrate Judge's Report and Recommendation on Defendants' Motion for Summary Judgment (Doc. No. 108) are **OVERRULED**.

**IT IS FURTHER ORDERED** that the Magistrate Judge's Report and Recommendation (Doc. No. 94) is **ADOPTED** by the Court.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 55) is **DENIED**.

_____
**JUDITH C. HERRERA**
**UNITED STATES DISTRICT JUDGE**